Commonwealth *v.* Moon, Appellant.

Argued April 23, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD and JONES, JJ.

*Edward Dumbauld,* with him *Thomas A. Waggoner, Jr.,* and *E. H. Beshlin,* for appellant.

*Frank P. Lawley, Jr.,* Deputy Attorney General, with him *Harrington Adams,* Deputy Attorney General, for appellee.

OPINION BY MR. JUSTICE ARNOLD, May 27, 1957:

The defendant, Norman W. Moon, murdered the Honorable Allison D. Wade, President Judge of Warren County. At his trial before a jury he was convicted of murder in the first degree and the jury imposed the death penalty, and defendant appeals.

Moon was directed to appear before Judge Wade on a charge of failure to comply with an order of support. (See Commonwealth v. Moon, 174 Pa. Superior Ct. 334, 101 A. 2d 147). The day before the date fixed for his appearance he cashed a check for $1,500 and purchased a forty-five calibre pistol, a box of shells and two clips, both of which were loaded when he entered the court room. Moon never paid anything on the support order entered against him. Having been ordered to appear before the Court of Quarter Sessions of Warren County for sentence (he was then in default $1,600 on the support order), he appeared before said court on January 13, 1954. When asked if he intended to comply with the order of support, Moon replied, "Absolutely not." When he stood before the court he drew the pistol in question, which had been loaded with one clip, and emptied the gun in various directions and at Judge Wade. Judge Wade stumbled from the dais and was prone on the floor of the court room when Moon fired two more shots. Judge Wade cried out, "Don't shoot, please don't shoot, I won't sentence you," to which Moon replied, "You God-damned . . . you will never get a chance to."

Judge Wade's death was almost instantaneous. Moon then reloaded his gun and while making his escape from the court room threatened to kill attorney Bonavita who attempted to stop him. Moon got into his automobile and soon after officers stopped progress of the automobile by shooting the tires. He then got out of the car and shot himself in the neck, and was taken to the Warren Hospital, where he recovered. Repeatedly during his trial the defendant stated that he was extremely mad or furious.

Subsequent to the verdict Moon presented a petition to appoint a commission to determine his mental condition. The court found him to be sane, but on appeal

this finding was reversed and this Court ordered a re-examination of the commission's findings and recommendation, and reconsideration of the evidence in the light of the statutory definition of mental illness. See *Commonwealth v. Moon,* 383 Pa. 18, 117 A. 2d 96. Thereafter the lower court executed the mandate of this Court, and entered an order refusing to commit him to a mental hospital and finding that it was not satisfied that he was mentally ill. On appeal this order was affirmed. See *Commonwealth v. Moon,* 386 Pa. 205, 125 A. 2d 594. Thereafter the court below heard the defendant's motion for new trial, denied the same, and this appeal followed.

The defendant, who took the stand on his own behalf, admitted all of the circumstances of the killing, but claimed the following trial errors:

(1) When examining on the voir dire the first juror drawn, counsel for appellant sought to ask the following hypothetical question: "Mrs. Knapp, again under the law of Pennsylvania, a person who at the time of the commission of any act which would otherwise be criminal, is unable to tell the difference between right and wrong and to appreciate the consequences of his acts, such a person is entitled to be found not guilty by reason of insanity. If you found from a fair preponderance of the evidence, that the accused at the time of the commission of this act, was unable to distinguish right from wrong and unable to appreciate the consequences of his act, would you then find him not guilty by reason of insanity?" The Commonwealth's objection was sustained and properly so. This Court declared in *Commonwealth v. Bentley,* 287 Pa. 539, at page 546, 135 A. 310: "In conducting the preliminary examination, considerable latitude must be permitted to elicit the necessary information, but it is to be strictly confined to inquiries disclosing qualifica-

tions, or lack of them, and not extended so as to include hypothetical questions, when their evident purpose is to have the jurors indicate in advance what their decisions will be under a certain state of the evidence or upon a certain state of facts, and thus possibly commit them to definite ideas or views when the case shall be finally submitted to them for their decision."

(2) The appellant claims the court below committed error in not sustaining the challenge for cause as to several jurors following examination on voir dire. These challenges for cause were made at a time when the defendant's peremptory challenges were not exhausted, and hence the refusal of the challenge cannot be prejudicial error. *Sayres v. Commonwealth,* 88 Pa. 291, 306, 307; *Commonwealth v. Bibalo,* 375 Pa. 257, 264, 100 A. 2d 45. The defendant is not entitled to the services of any particular juror but only as to twelve unprejudiced jurors.

(3) The defendant was not prejudiced by the action of the court in belatedly permitting the Commonwealth to challenge peremptorily one Honhart after he had been passed as a juror by the Commonwealth. The court, after excusing said juror, immediately, of its own motion, granted an additional peremptory challenge to the defendant. In *Commonwealth v. Schroeder,* 302 Pa. 1, 152 A. 835, the defendant was convicted of murder in the first degree and sentenced to death. The court there charged that certain evidence on credibility of one of the defendant's witnesses was substantive evidence of defendant's guilt. This Court commented, at page 11: "Apparently the court did inadvertently treat the evidence as substantive proof. *We are convinced that this instruction did defendant no harm and did not bring about her conviction."* (Italics supplied). Thus this Court there determined that even though the instruction was erroneous, if the court was convinced

that the defendant was not harmed thereby, the judgment and sentence would be affirmed. *" 'The defendant in a homicide case has no standing in an appellate court to complain of an erroneous instruction unless the error contributed to the result reached by the jury': Com. v. Winter, 289 Pa. 284 [137 A. 261]; Com. v. Divomte, 262 Pa. 504 [105 A. 821]." : Commonwealth v. Schroeder, supra.* (Italics supplied).

(4) The Commonwealth introduced the photograph of Judge Wade taken very shortly after the assault by the defendant. It was offered to show the location of the body in the court room and to show the direction of the bullet wounds in vital parts. Having examined the photograph carefully, we find that it was not inflammatory or prejudicial. It simply showed a body prone on the floor of the court room with stains, evidently blood, on its left side. Introduction of such exhibits is a purely discretionary matter for the trial judge, and we find no abuse of discretion: *Commonwealth v. Ballem,* 386 Pa. 20, 27, 123 A. 2d 728.

(5) The defendant next complains that he was not allowed to show the bias of the witness, Bernice R. Seavy. We have examined this assignment and find no merit in it. Evidently the appellant misunderstood the answer of the witness.

(6) Next the defendant objects to the memorandum made by Commonwealth's witness during an interview with the defendant while he was in the hospital. This memorandum was not signed or written by the defendant, nor is such necessary. The defendant was unable to speak due to his self-inflicted wounds and was instructed to nod his head yes or no, and to hold up fingers to indicate "how many." The memorandum was clearly admissible just as an unsigned or oral statement of the defendant would have been. Its weight was for the jury, and the defendant was not harmed

by the admission in evidence of the memorandum. The answers of the defendant to the questions asked were fully testified to by officers Naddeo and Mehallic.

(7) The defendant complains about the lower court's instructions on the question of the alleged insanity of the defendant. There was no prejudicial error in the court's charge on the question of insanity, although much is attempted to be made of the self-inflicted wounds of the defendant. See *Commonwealth v. Lewis*, 222 Pa. 302, 303, 71 A. 18; *Commonwealth v. Wireback*, 190 Pa. 138, 42 A. 542; *Commonwealth v. Barner*, 199 Pa. 335, 49 A. 60. This was examined by the jury, which rejected the plea of sympathy based thereon. See also *Commonwealth v. Moon*, 383 Pa. 18, 117 A. 2d 96, and *Commonwealth v. Moon*, 386 Pa. 205, 125 A. 2d 594.

Here the defendant was actuated by hatred of his wife and quite evidently had made up his mind that he would not comply with the court order against him for her support. The day before the killing he had obtained sufficient money to pay the back support, but refused to pay it, and instead murdered the judge who was about to order him to do so. The defendant had a night's sleep after he had purchased the gun and shells and obtained the $1,500. As long as we are to have the death penalty in Pennsylvania certainly this is a clear case for its imposition.

In accordance with the Act of February 15, 1870, P. L. 15, Section 2, 19 PS §1187, we have reviewed both the law and the evidence in this record, and have determined that all the ingredients necessary to constitute murder in the first degree have been proved to exist.

The judgment is affirmed, and the record is remitted to the court below for the purpose of execution.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion in this case says: "As long as we are to have the death penalty in Pennsylvania certainly this is a clear case for its imposition." It is indeed difficult to imagine a more flagrant violation of law and order than the assassination of a judge sitting in Court—provided, of course, the killer is sane. If the heinousness of the act is to dictate the punishment, regardless of sanity or insanity, then Norman W. Moon should be executed. But, as long as we have in Pennsylvania the rule that an insane person should not be executed, certainly this is the case to apply it. I would think that the very act of shooting a judge suggests insanity at the outset. The Majority thinks otherwise.

In addition, however, to the outer aspects of the case, we have the findings of a Sanity Commission, duly appointed by the Court, which unanimously found: "a. Norman W. Moon is in fact mentally ill. b. Norman W. Moon's mental illness is that of dementia praecox of the paranoid type. c. This illness is chronic and continuing. d. Norman W. Moon is a proper subject for commitment to a mental hospital."

The lower Court which appointed the commission, after lauding the abilities and integrity of its members, declined to follow its recommendations. This Court, on appeal, affirmed the declination. (386 Pa. 205). I dissented from this Court's decision and I still believe that, in accordance with the Commission's recommendations, the defendant should be committed to a mental hospital until such time as he will have regained sanity, when the matter of the verdict against him in the trial for murder may be disposed of in accordance with law and justice.

In my Dissenting Opinion (386 Pa. 219-231), I pointed out, as further evidence of Moon's insanity, the fact that he had set out to kill two other judges against whom he could not have had a sane animosity, namely,

Judge GUNTHER of the Superior Court, who had not written any Opinion against Moon, and the writer of this Opinion who had never theretofore participated in any way in any decision involving Moon. Moon had also tried to kill the district attorney of Warren County as well as the court stenographer, with neither of whom had he had any quarrel. And then he tried to kill himself, (a deed which could not possibly have brought him any advantage) by shooting himself in the neck. Moon was a man who had gone berserk. There was no rhyme, reason, purpose, or objective to his actions, so obviously maniacal. In my previous Dissenting Opinion I showed how the lower Court ignored the findings of a highly trained and qualified commission made up of two experienced doctors and a lawyer, and founded its conclusion mostly on the testimony of lay prison guards who were considerably limited in their appraisement of the subject of whom they spoke. I still believe the Court's action to have been serious error.

This is a case where the Courts should have been extremely cautious in reaching their conclusions so that it could not be said, no matter how incorrectly, that they were influenced in their decision by the fact that a judge had been killed.

Defendant's counsel in this appeal complains also of various trial errors. Without expressing my views on all the reasons advanced for a new trial, I wish to indicate my agreement with counsel's complaint that the prosecuting attorney improperly introduced in evidence a photograph of the body of Judge Wade, as it lay on the courtroom floor after the shooting. I believe that defense counsel is justified in complaining, as he does in his brief:

"The prosecuting attorney advanced two reasons in support of the offer: (1) to show the location of the

body in the courtroom; and (2) to show the location of the bullet wounds in vital parts causing death.

"Obviously the exhibit had no probative value and was not admissible under the first ground advanced. The testimony shows that the photograph does not depict the position or location of the body at the time of his death. The body had been moved, and the clothing had also been arranged so as to display prominently the gruesome spectacle of blood stains...

"With respect to the second reason advanced in support of the offer, it is obvious that Exhibit 4 was merely cumulative. It was not necessary to offer the photograph in order to prove the *corpus delicti* or cause of death.

"Before the photograph was offered, the Coroner had testified with respect to this point: 'Q. What was the cause of death? A. Two wounds on the left side between, about at the elbow (Witness indicating on his own body) made by bullets.'

"This testimony was subsequently elaborated and the witness illustrated his testimony adequately by indicating the location of the bullet marks on his own body...

"Thus the real purpose of offering the photograph was manifestly to shock and horrify the jury. For this purpose, as the trial Court concedes and as the decisions of this Court have often emphasized, the exhibit should not have been admitted. It should have been excluded as inflammatory and undoubtedly prejudicial to defendant."